UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:13-CV-00046-GNS-HBB

DENISE JOHNSON, individually and as
   Administratrix of the Estate of Clifford
   Dewayne Johnson                                                                            PLAINTIFF

v.

BUTLER COUNTY, KENTUCKY, et al.                                   DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendants' Motion for Summary Judgment (Defs.' Mot. for Summ. J., DN 24). Plaintiff has filed her response (Pl.'s Resp. to Mot. for Summ. J., DN 25 [hereinafter Pl.'s Resp.]), and Defendants have filed their reply (Defs.' Reply to Pl.'s Resp. to Mot. for Summ. J., DN 26 [hereinafter Defs.' Reply]). For the reasons stated below, the Court **GRANTS** Defendants' motion.

**I.     SUMMARY OF FACTS AND CLAIMS**

Plaintiff Denise Johnson ("Johnson") is the widow of Clifford Dewayne Johnson ("Dewayne"). (Johnson Dep. 7:22-24, Mar. 6, 2014, DN 28 [hereinafter Johnson Dep.]). Near the end of his life, Dewayne was a severe alcoholic. (Johnson Dep. 39:19-47:2; 55:1-10). On December 6, 2012, the Kentucky State Police cited and arrested Dewayne for alcohol intoxication in a public place and third-degree criminal trespassing. (Uniform Citation, DN 24-4). He was ordered to be held without bond, with a notation to "release only to hospital or

rehab." (Conditions of Release & Judicial Decision, DN 24-5). Dewayne was taken to the Butler County Jail the same evening while still intoxicated. (Terry Fugate Dep. 14:13-20, Apr. 30, 2015, DN 29; *see* Terry Fugate Dep. Ex. 9, DN 29-1).

Once in a cell, Dewayne began pounding on the door and yelling that he wanted to go home and that he had not hurt anyone. (Terry Fugate Dep. 16:17-17:11). At 6:40 p.m., he was speaking with his pretrial officer when the nurse, Tessa Fugate, now Tessa Lee ("Lee"), checked on him. (Defs.' Mot. for Summ. J. Ex. F, DN 24-7). At that time, Dewayne stated that he was short of breath. (Defs.' Mot. for Summ. J. Ex. F). Lee instructed him to take deep breaths and calm down, and she issued no new orders. (Defs.' Mot. for Summ. J. Ex. F).

The following day, December 7, Dewayne was moved from the "drunk tank" to a seven-man cell, where he continued to have "beating-and-banging issues." (Terry Fugate Dep. 21:14-15, 23:10). Shortly after midnight on December 8, Butler County Emergency Medical Service ("EMS") personnel responded to a call from the jail related to a report that Dewayne was having trouble breathing.[1] (Terry Fugate Dep. 23:10-24:03, 29:12-17). EMS personnel concluded that he was having "anxiety problems." (Terry Fugate Dep. 23:25-24:03). EMS was called a second time at approximately 2:30 a.m.; the results were much the same. (Terry Fugate Dep. 29:17-22). EMS was called a third time on December 8 at approximately 3:30 p.m. because Dewayne had fallen off of a bench and hit his head; EMS personnel again determined that his vital signs were within appropriate ranges. (Terry Fugate Dep. 28:20-29:14).

When EMS was called for the fourth and final time at 7:43 p.m. on December 8, Dewayne was unresponsive. (Trip Report, Butler County EMS 5, DN 24-14 [hereinafter Final EMS Report]). Prior to the arrival of EMS, a cell-mate and then a deputy had attempted CPR.

---

[1] The EMS station is located across the street from the Butler County Jail.

(Terry Fugate Dep. 48:7-49:10; Final EMS Report 5). EMS continued CPR until additional help arrived, at which point a defibrillator was used. (Final EMS Report 5). Once loaded into the ambulance, EMS personnel cleared Dewayne's throat of vomit and intubated him, but he was pronounced dead at a hospital in Bowling Green. (Final EMS Report 5-6; K. Fugate Dep. 20:22-21:05, Apr. 30, 2015, DN 30).

On April 17, 2013, Johnson filed this suit individually and as administratrix of Dewayne's estate against Butler County and sued the following persons in their individual capacities: Jailer Terry Fugate, Chief Deputy Jailer Rocky Tyree, RN Kelli Fugate and RN Tessa Fugate. (Compl, DN 1). Johnson alleges that Defendants: (1) violated Dewayne's Eighth and Fourteenth Amendment rights; (2) were negligent and grossly negligent; (3) acted "so beyond the bounds of human decency that it exemplifies the tort of outrage"; (4) violated KRS 411.130 (which addresses wrongful death); and (5) violated 501 KAR 3:090. (Compl. 6-7). She also brings a loss of consortium claim. (Compl. 7).

On September 21, 2015, Defendants filed their Motion for Summary Judgment. (Defs.' Mot. for Summ. J., DN 24). Plaintiff has filed her response (Pl.'s Resp.), and Defendants have filed their reply (Defs.' Reply). The motion is therefore ripe for adjudication.

## II.   JURISDICTION

Johnson alleges claims arising under 42 U.S.C. § 1983. This Court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Court has jurisdiction over Johnson's state-law claims as well, as the Court has "supplemental jurisdiction over all other claims that are so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

### III. STANDARD OF REVIEW

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of any material fact that would preclude entry of judgment for the moving party as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of stating the basis for the motion and identifying evidence in the record that demonstrates an absence of a genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 322. If the moving party satisfies its burden, the non-moving party must then produce specific evidence proving the existence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted). Rather, the non-moving party must present specific facts proving that a genuine factual issue exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

### IV. DISCUSSION

#### A. Eighth and Fourteenth Amendment Claims – Failure to Treat

As an initial matter, Dewayne was a pretrial detainee at the time of his death, and consequently the Eighth Amendment is inapplicable. *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001) ("The Eighth Amendment does not apply to pretrial detainees."). The

4

Court must therefore grant summary judgment to Defendants as to Johnson's Eighth Amendment claim.

Pretrial detainees do, however, "have a right to adequate medical treatment that is analogous to the Eighth Amendment rights of prisoners," which is properly pleaded under the Fourteenth Amendment. *Id.* at 685-86. "To sustain a cause of action under § 1983 for failure to provide medical treatment, plaintiff must establish that the defendants acted with 'deliberate indifference to serious medical needs.'" *Id.* at 686 (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Negligence will not suffice to show deliberate indifference; instead "the defendants [must have known] of and disregarded a substantial risk of serious harm to [Dewayne's] health and safety." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 835-37 (1994)). Further, the standard has both an objective and subjective component. "The objective component requires the existence of a 'sufficiently serious' medical need." *Preyor v. City of Ferndale*, 248 F. App'x 636, 642 (6th Cir. 2007) (internal quotation marks omitted) (quoting *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004)). The subjective component requires that "the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

The Complaint and Johnson's response to Defendant's motion for summary judgment are couched in terms which infer that Dewayne died of delirium tremens ("DTs)", which is a form of severe alcohol withdrawal. (Compl. 4; Pl.'s Resp. 10 ("The jail was well aware of [Dewayne's] long-term history of alcoholism and the issues associated with it . . . .")). Problematically, Johnson has provided no evidence of the cause of Dewayne's death.

The final EMS Trip Report on December 8, 2012, lists Dewayne's chief complaint as "unresponsive" and his secondary complaint as "cardiac arrest, resuscitation in progress." (Final

5

EMS Report 2). The medication log at the Butler County Jail reflects that, at the time of his death, Dewayne was prescribed chlordiazepoxide, Coumadin (also known as warfarin), vitamin B, Nexium, Benicar HCT, and buspirone. (Medication Administration R, DN 24-16). Lee had added Phenergan to Dewayne's medication list for vomiting, to be taken as needed. (Lee Dep. 10:1-11, Apr. 30, 2015, DN 31).

Dr. Grady J. Bazzel ("Dr. Bazzel"), Defendants' medical expert, opines that Dewayne died from "an acute, retroperitoneal bleed due to his supratherapeutic level of warfarin" based on Dewayne's records from the Medical Center in Bowling Green, KY. (RE: Estate of Dewayne Johnson v. Butler County, et al. Case No. 1:13-CV-46-R, at 1, 3-4, DN 24-18 [hereinafter Bazzel Report]). Dr. Bazzel focuses specifically on laboratory records from a November 29, 2012, visit to the Emergency Room and laboratory records from Dewayne's final visit to the Medical Center on December 8, 2012. (Bazzel Report 3-4).

On November 29, 2012, Dewayne's "hematocrit, a measure of blood volume, . . . [was] essentially normal at 38.1." (Bazzel Report 3). When he was admitted to the Medical Center shortly before his death on December 8, 2012, however, Dewayne's "hematocrit was noted to be 19.1 indicating that he had lost approximately half his blood volume during the intervening 9 days." (Bazzel Report 3). "Additionally, he was noted to have an INR, a measure of the level of warfarin, of 9.1. When a patient's INR exceeds 7, the risk for significant spontaneous bleeding goes up markedly." (Bazzel Report 4). Dr. Bazzel further explains that there is a potential space behind the kidneys—the retroperitoneal space—that can hold a large volume of blood. (Bazzel Report 4). Based on these circumstances, Dr. Bazzel has expressed his opinion that Dewayne experienced a slow peritoneal bleed, the resulting volume of blood emptied into his peritoneal

6

space depriving his organs of oxygen, and this lack of oxygen led to the heart attack that caused Dewayne's death. (Bazzel Report 4).

By contrast, Johnson has presented no evidence of the cause of Dewayne's death. She focuses on what she believes was the *intent* of the jail staff: to save money by not sending Dewayne to the hospital. (Pl.'s Resp. 10). Johnson argues that "[c]ommon sense would indicate that four EMS calls in a 24-hour period warrants a trained health care professional's care, intervention, and treatment." (Pl.'s Resp. 10). This argument is somewhat confusing, as the jail staff did seek medical treatment for Dewayne in the form of EMS calls on each of those four instances, which certainly refutes the notion that Defendants were ignoring Dewayne's medical needs.

Johnson has presented no evidence to support the argument that Dewayne should have been taken to the hospital by EMS on any of the first three trips EMS made that day. EMS personnel Dwight Jenkins, who responded to the third call for Dewayne on December 8, testified that Dewayne's vitals were within range, that he looked stable, and that he did not have any pain. (Jenkins Dep. 3:23-14:24, 17:20-21, July 22, 2015, DN 35). Given that Dewayne appeared to have nothing wrong with him other than difficulty breathing due to an anxiety attack, the EMS personnel apparently believed that Dewayne did not need to be transported to the emergency room. (Trip Report Butler County EMS 2, DN 24-11). There has been absolutely no proof that any jail personnel ignored Dewayne's need for medical care or failed to follow any recommendations of the EMS attendants while he was in custody shortly before his death.

In order for Defendants to have violated Dewayne's Fourteenth Amendment rights by denying him medical treatment, there must have first been a sufficiently serious medical need. The evidence shows, however, that the only medical need Dewayne manifested prior to the final

EMS call was treatment for anxiety. Courts have recognized that anxiety is not a sufficiently serious medical need, but regardless, EMS was alled multiple times to check Dewayne's symptoms. *See Silverstein v. Fed. Bureau of Prisons*, 559 F. App'x 739 (10th Cir. 2014). Johnson points to Dewayne's medication, specifically Librium and Phenergan, and argues that Dewayne did have a sufficiently serious medical need due to his alleged DTs. (Pl.'s Resp. 3). Absent some competent proof that Dewayne actually suffered from DTs or that this condition caused his death, this claim is of no avail.

Although Lee was aware that Dewayne was prescribed Phenegran and Librium, she was not his physician and did not know why these medications were prescribed. (Lee Dep. 13:15-14:14). The symptoms of DTs that would have alerted the Individual Defendants that Dewayne was experiencing DTs are tremor, confusion, fast heart rate, high blood pressure, profuse sweating, extended deep sleep, and seizures. (Lee Dep. 12:7-13; K. Fugate Dep. 22:15-23:03; Bazzel Report 3). There is no evidence in the record, however, that Dewayne exhibited any of these symptoms.

Indeed, Jailer Terry Fugate[2] stated that the jail staff "never did ever even think that [Dewayne] was having any type of withdrawals or [DTs] or—nor did the ambulance service. . . . Because of his blood rate, blood pressure and so forth, nobody ever mentioned anything to me that they thought that—that it was any type of a withdrawal." (Terry Fugate Dep. 31:22-32:5). Dr. Bazzel states it even more strongly: "During his incarceration in the county jail, [Dewayne] never exhibited any signs of significant alcohol withdrawal much less delirium tremens." (Bazzel Report 3). In sum, the evidence shows that there is no genuine issue of material fact about

---

[2] Terry Fugate and Johnson had known each other for more than thirty years and were close friends. (Terry Fugate Dep. 11:21-12:13, 39:22-25; Johnson Dep. 85:23-24, Mar. 6, 2014, DN 28-1). Terry Fugate served as a pallbearer at Johnson's funeral at Plaintiff's request. (Terry Fugate Dep. 51:13-14; Johnson Dep. 85:25-86:4).

8

whether Dewayne was suffering from DTs—he was not. Johnson has provided no evidence to the contrary, and she fails in her attempt to second-guess the care provided to Dewayne by Defendants.

Absent a sufficiently serious medical need, Defendants could not have violated Dewayne's Fourteenth Amendment rights by failing to provide medical treatment. *See Spears v. Ruth*, 589 F.3d 249, 255 (6th Cir. 2009). As the Sixth Circuit has noted, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976) (citation omitted). Therefore, summary judgment will be granted to Defendants as to Johnson's remaining Section 1983 claim for failure to treat for unproven alcohol-withdrawal symptoms.

### B.     State Law Claims Against Butler County

In addition to her Section 1983 claims, Johnson alleges several state-law claims, namely negligence, gross negligence, outrage, wrongful death, loss of consortium, and violation of 501 KAR 3:090. (Compl. 6-7). As a preliminary matter, Defendant Butler County is entitled to sovereign immunity. *Comair, Inc. v. Lexington-Fayette Urban Cty. Airport Corp.*, 295 S.W.3d 91, 94 (Ky. 2009). The Court will therefore grant summary judgment to it as to the remainder of Johnson's claims asserted against Butler County.

### C.     State Law Claims Against Individual Defendants

#### 1.     *Negligence/Gross Negligence*

"To recover on a common law negligence claim in Kentucky, there must be a duty on the defendant's part, a breach of that duty, and consequent injury." *T & M Jewelry, Inc. v. Hicks*, 189 S.W.3d 526, 530 (Ky. 2006). In general, the Kentucky Supreme Court has adopted a "universal

9

duty of care," which requires every person to exercise "the same degree of care as a prudent person engaged in a similar or like business would exercise under the circumstances." *Id.* "Consideration must also be given to whether the harm to the plaintiff resulting from the defendant's negligence was foreseeable." *Id.* at 531. Kentucky courts have interpreted KRS 71.040 as imposing upon jailers a duty of reasonable care over the inmates under their charge. *Sudderth v. White*, 621 S.W.2d 33, 35 (Ky. App. 1981).

Setting aside duty and breach *arguendo*, Johnson's claims of negligence and gross negligence fail for lack of foreseeability. One "cannot be charged with negligence in failing to prevent what he could not reasonably anticipate." *Ratliff v. Stanley*, 7 S.W.2d 230, 232 (Ky. 1928). On each of the three times EMS was called to the jail between midnight and 3:30 p.m. on December 8, Dewayne's vitals were within normal ranges. Before Dewayne was discovered unresponsive and EMS was called for the final time, there is no proof that the Individual Defendants had reason to suspect that Dewayne was suffering from anything other than anxiety attacks, or had any notice of a suspected retroperitoneal bleed. Absent the necessary foreseeability, Johnson's claims of negligence and gross negligence against the Individual Defendants fail.

### 2.   *Outrage (Intentional Infliction of Emotional Distress)*

Under Kentucky law, claims of intentional infliction of emotional distress ("IIED") require proof that: "[t]he wrongdoer's conduct must be intentional or reckless; the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality; there must be a causal connection between the wrongdoer's conduct and the emotional distress and the distress suffered must be severe." *Osborne v. Payne*, 31 S.W.3d

911, 913-14 (Ky. 2000). The tort "is intended to redress behavior that is truly outrageous, intolerable and which results in bringing one to his knees." *Id.* at 914 (citation omitted).

The tort of outrage or IIED is a gap-filler. *See Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 298-99 (Ky. App. 1993) (noting that IIED is "a 'gap-filler' providing redress for extreme emotional distress in those instances in which traditional common law actions did not . . . ."). More specifically, "a plaintiff cannot maintain *both* a negligence claim and an intentional infliction of emotional distress claim based on a single set of facts." *Childers v. Geile*, 367 S.W.3d 576, 581 (Ky. 2012). Accordingly, the Court will grant summary judgment to the Individual Defendants, as Johnson has alleged negligence on the same set of facts forming the basis for her IIED claim. There is certainly no evidence in this case that the Individual Defendants acted outrageously towards Dewayne. To the contrary, the proof in the record reflects that EMS was called several times before Dewayne was found unresponsive and there was no medical advice given by EMS personnel that any Individual Defendant failed to follow. Summary dismissal is therefore required on the IIED claim.

### 3. *501 KAR 3:090*

501 KAR 3:090 governs the provision of medical services in Kentucky jails. 501 KAR 3:090. This regulation contains 3 sections with 26 subsections, and Johnson has not identified which of those subsections she believes the Individual Defendants have violated. (*See* Compl. 6). In reviewing the allegations in the Complaint, however, the Court will infer that Johnson alleges a violation of 501 KAR 3:090 § 1(21), which states simply that, "[i]f emergency care is needed, it shall be provided." 501 KAR 3:090 § 1(21).

As detailed above, the Individual Defendants did provide emergency care four separate times on December 8, 2012, and there is **no proof** that any jail personnel failed to follow any

11

recommendations of the emergency medical providers. Because the evidence shows that no violation of 501 KAR 3:090 § 1(21) occurred, and Johnson has not sufficiently pleaded a violation of any other subsection, the Court will grant summary judgment to the Individual Defendants as to this claim.

### 4. *Wrongful Death*

"Whenever the death of a person results from an injury inflicted by the negligence or wrongful act of another, damages may be recovered for the death from the person who cause it, or whose agent caused it . . . ." KRS 411.130(1). Because the Court has determined that the Individual Defendants committed no negligence or wrongful act, Johnson's wrongful death claim fails. The Court will therefore grant summary judgment to the Individual Defendants on this claim.

### 5. *Loss of Consortium*

"Either a wife or husband may recover damages against a third person for loss of consortium, resulting from a negligent or wrongful act of such third person." KRS 411.145(b). Because the Court has determined that Plaintiff failed to produce any evidence that any Individual Defendant committed any negligence or wrongful act, Johnson's loss of consortium claim fails. The Court will therefore grant summary judgment to the Individual Defendants on this claim.

## V. CONCLUSION

For the reasons foregoing reasons, Defendants' Motion for Summary Judgment (DN 24) is **GRANTED**.

A separate judgment will follow.

**Greg N. Stivers, Judge**
**United States District Court**
January 20, 2016

cc: counsel of record